**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JAMES LEE ABBOTT,**

      **Plaintiff,**

**v.**                             **Case No.: 3:15-cv-12801**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

      This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 12, 13).

      The undersigned has thoroughly considered the evidence and the applicable law. For the following reasons, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **REVERSED;** this matter be **REMANDED** for further proceedings

pursuant to sentence four of 42 U.S.C. § 405(g); and this action be **DISMISSED, with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

On January 3, 2011, Plaintiff James Lee Abbott ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of October 20, 2008, (Tr. at 283, 290), due to "Bipolar Disorder, Crushed Left Foot 2008, [and] Hx [history] of kidney stones." (Tr. at 341). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 10). Claimant filed a request for an administrative hearing, which was held on July 10, 2012 before the Honorable Charlie Andrus, Administrative Law Judge ("ALJ Andrus"). (Tr. at 34-54). By written decision dated July 27, 2012, ALJ Andrus found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 85-97). On September 4, 2013, the Appeals Counsel remanded Claimant's case back to ALJ Andrus for further review;[1] however, ALJ Andrus had left the SSA by that time. (Tr. at 104-107). As a result, a second administrative hearing was held on December 10, 2014, before the Honorable Maria Hodges, Administrative Law Judge (the "ALJ"). (Tr. at 55-77). By written decision dated February 5, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 10-25). The ALJ's decision became the final decision of the Commissioner on June 29 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42

---

[1] The Appeals Council ordered the ALJ to (1) give further consideration to Claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations; (2) if warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Claimant's occupational base; and (3) determine whether Claimant has a medically determined substance abuse disorder. (Tr. at 105-07).

U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 9, 10). Claimant then filed a Brief in Support of Judgment on the Pleadings. (ECF No. 12). In response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 13). Consequently, the matter is fully briefed and ready for resolution.

## II.   Claimant's Background

Claimant was 44 years old at the time of the alleged onset of disability, and 48 years old at the time of the ALJ's decision. (Tr. at 10, 58). He has at least a high school education and communicates in English. (Tr. at 340, 342). Claimant previously worked as a car painter and welder. (Tr. at 59-60, 342)

## III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability

3

to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to

determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2013. (Tr. at 13, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since October 20, 2008, the alleged disability onset date. (*Id.* at No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "cannabis use, depression, anxiety, left foot injury, and coronary artery disease." (*Id.* Finding No. 3). The ALJ also considered various physical ailments reflected in Claimant's medical records, but determined that they were non-severe. (*Id.*). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 13-14, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except limited to standing/walking for four hours out of an eight-hour workday. He could occasionally use foot controls with the left foot. He could occasionally climb ramps/stairs, kneel, or crouch, but never climb ladders, ropes, or scaffolds, or crawl. He could frequently balance and stoop. He should avoid concentrated exposure to temperature extremes, wetness, humidity, pulmonary irritants (fumes, odors, dusts, gases, poor ventilation, etc.), and vibrations. He should avoid even occasional hazards, (dangerous moving machinery, unprotected heights, etc.). He could still perform simple, routine, repetitive tasks, in low stress work, defined as no production quotas or strict time limits. He should have no interaction with the general public and only occasional interaction with co-workers and supervisors. He could adapt to occasional changes in the work setting and perform jobs with minimal independent judgment required.

(Tr. at 14-23, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 23-24, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful

activity. (Tr. at 24-25, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1967, and was defined as a younger individual age 18-49 on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because using the Medical-Vocational Rules as a framework, Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 24, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a machine tender or routing clerk at the unskilled light level, and inspector or security monitor at the sedentary unskilled level. (Tr. at 24-25, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 25, Finding No. 11).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. (ECF No. 12 at 9-12). First, Claimant argues that the hypothetical question posed by the ALJ to the vocational expert did not fully reflect Claimant's limitations as determined by the ALJ in the RFC finding. Specifically, Claimant contends that the ALJ limited him to light exertional level work with only two hours of standing or walking in an eight-hour workday. However, when the ALJ provided the controlling hypothetical question to the vocational expert, the ALJ asked the expert to assume that the hypothetical individual could perform light level work with standing or walking limited to four hours in an eight-hour workday. Claimant asserts that the discrepancy between the RFC finding and the hypothetical question renders the vocational expert's testimony regarding available jobs unreliable.

7

Second, Claimant alleges that the ALJ improperly weighed the opinion of Dr. Claire Belgrave, one of Claimant's treating psychiatrists. Claimant points out that the ALJ was mistaken regarding the number of visits Claimant had with Dr. Belgrave, and the ALJ failed to contact Dr. Belgrave to inquire about her opinions. According to Claimant, the Appeals Council tasked the ALJ with clarifying Dr. Belgrave's opinions on remand; however, the ALJ did not abide by this directive.

In response, the Commissioner contends that Claimant has misinterpreted the ALJ's RFC finding given that the ALJ adopted a medical source opinion limiting Claimant to four hours of standing or walking, not two hours. (ECF No. 13 at 10-11). The Commissioner argues that the RFC finding and the hypothetical question were absolutely consistent; consequently, the vocational expert's testimony was reliable and provided substantial evidence in support of the final determination of non-disability.

With respect to Dr. Belgrave's opinions, the Commissioner indicates that the ALJ was instructed on remand to clarify the weight given to Dr. Belgrave's opinions, and to contact Dr. Belgrave if necessary. (*Id.* at 11-14). However, based upon evidence suggesting that Claimant had a substance abuse problem that significantly affected his RFC assessment, the ALJ decided to send medical interrogatories to a psychiatrist specializing in substance abuse. The psychiatrist, Dr. Stuart Gitlow, opined that Claimant did not have a primary psychiatric illness that was unrelated to his substance abuse. In addition, Dr. Gitlow disputed Dr. Belgrave's opinions, because they were not supported by medical findings or by evidence of a negative toxicology screen. The Commissioner argues that the ALJ resolved any discrepancies in the prior decision and provided good reasons for the weight given to Dr. Belgrave's opinions. Accordingly, the decision of non-disability was supported by substantial evidence.

8

## V.    **Relevant Medical Evidence**

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### *A. Treatment Records*

Claimant presented to Cabell Huntington Hospital on November 11, 2008 as a result of a work injury to his left foot, which had occurred three weeks prior. (Tr. at 683-90). The injury was described as a direct blow to the foot from a steel beam. (Tr. at 689). Claimant indicated that the pain in his foot was moderate and impeded his ability to work. Upon examination, both the feet and toes demonstrated normal range of motion. Perfusion of the foot, as well as of the lower extremities, was noted to be within normal limits. All other systems were reviewed and found negative. A CT scan of the left foot revealed acute fractures involving the medial cuneiform and base of the second metatarsal. There did not appear to be any significant displacement; however, the fractures did appear minimally comminuted. There were no other dislocations or findings detected. (Tr. at 686). Claimant was provided a work excuse and was discharged in stable condition with a prescription for Lortab. (Tr. at 690). He was advised to follow up with Felix Cheung, M.D.

Claimant returned to Cabell Huntington Hospital on February 19, 2009 for an MRI of his left foot ordered by Dr. Cheng. (Tr. at 691-92). The MRI revealed fractures to the medial cuneiform at the lateral plantar aspect and at the base of the second metatarsal. There appeared to be a small amount of fluid signal within these regions; however, the radiologist felt this could be attributed to changes of acute injury, or might simply be reactive. There was no definite significant bone marrow edema, which the radiologist felt

9

might potentially rule-out acute osseous injury. The remaining osseous structure appeared unremarkable other than osteoarthritic changes at the first MTP. There was no definite soft tissue abnormality. (*Id.*).

On August 19, 2009, Claimant presented to Dr. Ahmet Ozturk at Cabell Huntington Hospital's Regional Pain Management Center ("CHH Pain Management") for treatment of the work-related injury to his left foot. (Tr. at 434-40, 1105-10). Claimant complained of anxiety and daily left foot pain, which he described as constant, dull, aching, burning, and stabbing. (Tr. at 434-35). He rated the pain as usually being six on a ten-point pain scale, with the most severe pain being nine out of ten. (Tr. at 435). Pain in the foot was triggered by bending forward or backward, standing, and walking. Claimant used ice packs, elevated his foot, and took Aleve for pain relief. Claimant relayed the history of his foot injury to Dr. Ozturk, reporting that x-rays taken at Teays Valley Hospital immediately after the accident in 2008 showed no evidence of fracture or dislocation. Claimant had returned to light duty work until November 10, 2008, when he resumed regular work status; however, he continued to have left foot problems. A CT scan taken in November 2008 showed several fractures to his left foot. Claimant was given pain medication, placed off work, and referred to Dr. Cheung. Claimant began physical therapy in March 2009, which was ongoing, and according to Claimant, his left foot was improving.

A review of systems was positive for heartburn, hematuria, kidney stones, muscle pain, aches, weakness, and stiffness. Claimant also complained of depression/anxiety, explaining to Dr. Ozturk that he suffered from mild anger, stress, irritability, depression, and guilt. Claimant described additional symptoms such as trouble staying asleep and feeling tired and fatigued during the day. (Tr. at 436). Claimant denied use of alcohol or

drugs. (Tr. at 437). He described his daily habits as staying in bed or in a recliner and watching television. He also did light housework and shopping, and he was independent in daily grooming activities. According to Claimant, he could stand for 30-60 minutes, walk for 30-60 minutes, sit for an unlimited period of time, and lift between 25-50 pounds. (*Id.*).

On physical examination, Claimant was alert, oriented, and in no acute distress. He appeared well-developed and well-nourished. Claimant's left lower extremity was discolored, with edema and taunt skin. He had a lower temperature in the left foot than in the right foot, and the left foot had hypesthesia or hypalgesia. (Tr. at 438). Nevertheless, the movement of Claimant's lower extremities were unrestricted and non-painful, and there was no evidence of obvious muscle weakness, wasting, or reduced strength. His peripheral pulses were palpable bilaterally with no dystrophic changes. Dr. Ozturk assessed Claimant with complex regional pain syndrome of the left foot. (Tr. at 438). Dr. Ozturk offered Claimant a customized treatment plan, which included psychological and physical therapy assessments in the diagnostic phase; therapeutic blocks, physical therapy, and psychological counseling in the therapeutic phase; a return to work in the maintenance phase, and prescriptions for Lyrica, Clonidine, Cymbalta and Elavil. (Tr. at 438-39). Dr. Ozturk also ordered an x-ray of Claimant's left foot, which was performed at Cabell Huntington Hospital on August 26, 2009. (Tr. at 441, 679, 693). The x-ray was negative for acute displaced fracture or dislocation. The fractures of the medial cuneiform and base of the second metatarsal previously seen on the MRI in February 2009 were not appreciated on this x-ray; however, an apparent deformity of the mid aspect of the third metatarsal was seen, which the radiologist felt could be secondary to a prior injury. (*Id.*).

Claimant was scheduled for evaluations by Dr. Rehan Memon, an interventional pain management specialist at the CHH Pain Management, on October 12 and 27, 2009, but did not appear. (Tr. at 442, 446). However, on October 20, 2009, and again on November 3 and December 11, 2009, Claimant underwent lumbar sympathetic blocks administered by Dr. Ozturk. (Tr. at 443-45, 447-52). The blocks were given without complication, and Claimant tolerated them well.

On December 23, 2009, Claimant was examined by Pamela Rice-Jacobs, a Certified Family Nurse Practitioner ("CFNP") working with Dr. Ozturk. (Tr. at 453-56). Claimant complained of a sharp pain up and down his left leg. (Tr. at 453). Otherwise, he had no changes in the review of systems. Claimant reported the lumbar sympathetic block at left L4 received on December 11 provided little pain relief. He rated his pain level as averaging a six out of ten, with his worst pain being nine out of ten. Claimant did not provide a new list of medicines at this visit, and Nurse Rice-Jacobs documented that Claimant was not currently taking any medications. Claimant reported no change in his physical functioning, mood, family relationships, or overall functioning; however, he did note increased difficulty sleeping due to pain in the left leg and foot. (Tr. at 454). Nurse Rice-Jacobs performed a physical examination, describing Claimant's affect as flat, although he was alert and oriented. The temperature of Claimant's lower extremities was noted to be the same bilaterally. Both extremities were pink, warm, and dry, although Claimant's left leg appeared "slightly ruddier." (*Id.*). His toes moved well, with a bit of "touchiness" on the lateral left foot. Claimant reported he worked previously in construction but due to his foot injury, he could not resume construction work. Nurse Rice-Jacobs indicated that Claimant might need a functional capacity evaluation in the near future. Nurse Rice-Jacobs commented that Claimant had three prior lumbar

sympathetic injections, but was not consistently receiving the blocks, noting that he had missed three treatments. (Tr. at 454-55). Nurse Rice-Jacobs felt the blocks helped the circulation in Claimant's extremity, but by his report, did not seem to alleviate his pain. In discussion, Claimant explained that most of the medications prescribed to him by Dr. Ozturk were not approved by Workers Compensation, so he was not taking them. (Tr. at 455). After speaking with Dr. Ozturk, Nurse Rice-Jacobs provided Claimant with new prescriptions for Lyrica, Cymbalta, and Elavil, which she described as neuro-soothing medications. rather than narcotics. Claimant was told to return in one month to six weeks to see Dr. Ozturk.

Claimant returned on February 25, 2010, reporting to Nurse Rice-Jacobs that he was having left foot, left hip, and low back pain; otherwise, there was no change in his review of systems. (Tr. at 457). Claimant's pain level on average had increased to eight out of ten, with the worst pain being ten out of ten. However, Claimant's quality of life, relationships, activities of daily living, and overall functioning were unchanged from his prior visit. (Tr. at 458). He was tolerating the medications well without significant side effects. On examination, Claimant's left foot was warm to the touch, without active signs of complex regional pain syndrome. Claimant complained of some difficulty walking, demonstrating a slightly abnormal gait that improved after a few steps. Claimant reported that he stopped taking Elavil as it made him feel disoriented; however, he had no problems with Cymbalta, Clonidine, and Lyrica. He was directed to continue with those medications, start physical therapy, and return in two months. (Tr. at 459). When Claimant returned on April 27, 2010, he reported continued low back and left leg pain, with an average pain level of seven out of ten. (Tr. at 461-64). Otherwise, his review of systems, reports of functioning, and findings on examination were unchanged.

Beginning May 3 and continuing through June 15, 2010, Claimant participated in ten sessions of physical therapy at CHH Pain Management. (Tr. at 465-74). On May 3, Claimant reported that he had experienced foot pain at the conclusion of the initial evaluation; however, the pain had somewhat subsided. Sam Litteral, DPT, initiated physical therapy treatment with Anodyne therapy to the left foot, followed by various exercises. Mr. Litteral noted that Claimant moved his left foot very cautiously. (Tr. at 465). On May 5 and May 7, Claimant reported some left foot pain after therapy although he tolerated treatment well. (Tr. at 466-67). On May 10, Claimant reported his pain was increasing with exercise, but he was not having any other issues with therapy. (Tr. at 468). On May 21, although Claimant had no significant changes, he did report pain located on the top of the left foot. Mr. Litteral also documented that Claimant required overall conditioning due to the nature of the foot injury. (Tr. at 469). On May 24, Claimant indicated that his foot was very slow to respond to treatment. He had increased pain following therapy, but he felt that exercising his upper body was beneficial. (Tr. at 470). At this visit, Claimant tolerated the addition of upper extremity conditioning well without new complaints. On May 26, Claimant reported no change to his left foot, and while he continued to complain of pain, he did report he was much improved. (Tr. at 471). The therapist opined that Claimant was doing better than Claimant realized, and was progressing and improving. Throughout his June treatments, Claimant continued to report pain following treatment; however, he completed the treatments without complaint and reported that his body was beginning to adapt to the program. By June 15, Claimant was noted to be "doing well...safe with all exercises...not having any unexpected problems, nor...complaining about anything." (Tr. at 472-74).

On June 25, 2010, Claimant presented to CHH Pain Management for examination

by Dr. Memon. (Tr. at 475-78, 1094-97). Claimant complained of left foot, left leg, and low back pain, with the pain averaging seven out of ten. Claimant reported no change in any other systems. Claimant told Dr. Memon that lumbar sympathetic blocks followed by physical therapy provided fifty to seventy-five percent pain relief. (Tr. at 476). Regarding Claimant's activities of daily living and quality of life, his physical functioning was better; however, his mood, family relationships, sleep and overall function were unchanged. Dr. Memon examined Claimant, finding him to be alert and oriented with a "rather flat" affect, but in no distress. The skin temperature of Claimant's left leg was cooler than the right leg, but the only other abnormal finding was somewhat limited range of motion at the left ankle. (Tr. at 477). Dr. Memon documented that Claimant had received lumbar blocks and physical therapy, and he was currently participating in work rehabilitation and a conditioning program. Dr. Memon felt that once Claimant completed those therapies, he would need vocational rehabilitation. Dr. Memon was optimistic about Claimant's success at achieving his goal of returning to work with modified duties, observing that Claimant was "improving quite a bit." (*Id.*).

Claimant returned to Dr. Memon on July 15, 2010 with complaints of left leg and foot pain after having completed four weeks of vocational rehabilitation. Claimant stated that the pain averaged five and was eight at its worst. (Tr. at 479, 1090). He asked Dr. Memon to order an additional four weeks of work hardening. He reported that since his last visit, his activities of daily living and quality of life were the "same to better." (Tr. at 480, 1091). Claimant's physical examination was unchanged. Dr. Memon documented that Claimant had reached at least 50% of his preinjury level and would probably reach his preinjury level of 100 pounds with additional work hardening. (Tr. at 481, 1092). Dr. Memon agreed that Claimant should participate in four more weeks of work hardening

15

with the goal of obtaining preinjury levels and gradually increasing his weight bearing load. Dr. Memon also planned to write Claimant's workers compensation agent to explain Claimant's working diagnosis of Reflex Sympathetic Dystrophy ("RSD").[2]

On July 29, 2010, Claimant went to the Emergency Department at Cabell Huntington Hospital with flu-like symptoms, including nausea and vomiting. (Tr. at 655-676, 695-702). His psychological condition, including affect and behavior, was noted to be "Appropriate, Calm, Cooperative." (Tr. at 670). Claimant was interviewed by a nurse and admitted to drinking a six-pack of beer per week. (Tr. at 671-72). He denied recreational drug use, but reported smoking cigarettes. Laboratory studies were performed, and Claimant's physical examination was unremarkable. Claimant was diagnosed with vomiting and was offered a prescription for Phenergan. (Tr. at 664). Claimant declined the prescription, stating that he had only come to the hospital because he was at work hardening and the therapist felt he should come. (Tr. at 661). Claimant was given a slip excusing him from work hardening for a couple of days. (Tr. at 656).

Claimant returned to Cabell Huntington Hospital's Emergency Department on August 13, 2o1o with a complaint of shortness of breath. (Tr. at 641-54, 703-13). His affect and behavior were noted to be appropriate, calm, and cooperative. (Tr. at 703). When asked about the use of alcohol and recreational drugs, Claimant admitted that he occasionally drank a six-pack of beer and had used marijuana approximately one month earlier. (Tr. at 705). He was discharged later that same day with a Proventil inhaler. (Tr. at 642).

---

[2] Complex regional pain syndrome ("CRPS"), also called Reflex Sympathetic Dystrophy ("RSD") "is a chronic pain condition most often affecting one of the limbs (arms, legs, hands, or feet), usually after an injury or trauma to that limb. CRPS is believed to be caused by damage to, or malfunction of, the peripheral and central nervous systems." *See* NIH Publication No. 13-4173, National Institute of Neurological Disorders and Stroke, National Institutes of Health, Bethesda, MD 20892.

Claimant returned to the Emergency Department the following evening, on August 14, 2010, again complaining of difficulty breathing and shortness of breath, which had been ongoing for the past two days. (Tr. at 604-40, 710-24). Claimant reported that he had been seen in the Emergency Department the day prior with the same complaints and had been given an inhaler; however, his symptoms had not improved. Claimant also complained of non-radiating left chest pain, sweating, and labored breathing. Claimant told the Emergency Department physician he was beginning to feel better and believed he might have had a panic attack. Claimant's described his symptoms as transient over several days, lasting minutes, fluctuating in intensity, and exacerbated by exertion. (Tr. at 714). Claimant denied using alcohol at one point, (Tr. at 611, 715), but at another point, admitted that he occasionally drank a six-pack of beer, smoked cigarettes, and used marijuana. (Tr. at 623, 712). Claimant's physical examination and his EKG were unremarkable. (Tr. at 716, 723). A chest x-ray revealed the heart and lungs were within normal limits, while a CT scan revealed normal findings with no evidence of pulmonary embolism. (Tr. at 719, 721). Claimant's psychiatric condition was initially noted to be "anxious and restless" although he calmed down once he was placed in a room. (Tr. at 620). He advised the nurse that he occasionally took "Oxy" and "Xanax" or "Klonopin" for pain and anxiety, but had not had any medication for several days. Prior to discharging Claimant, the treating physician questioned him again about his statement to the nurse concerning his use of pain medication and Xanax. (Tr. at 612). Claimant admitted to using medications prescribed to his friends and then advised the physician that he felt better and would be going home. (*Id.*). Claimant was discharged home with a diagnosis of chest pain and given a prescription for Vistaril. (Tr. at 717).

Claimant returned to CHH Pain Management on August 25, 2010 and was

examined by Nurse Rice-Jacobs. (Tr. at 483-86). Claimant reported he had abruptly stopped taking Cymbalta because it was not approved, and he had "flipped out," resulting in a three-day hospitalization. (Tr. at 484). Claimant reported having depression and anxiety. During the hospital admission, Claimant was given medication for breathing issues and anxiety and once he starting taking Cymbalta again, he was much more stable.

Claimant indicated his physical function and overall function were "same to better;" however, his mood since the last visit was worse. Claimant appeared alert and oriented with a flat affect. Claimant continued to have pain, but described it as averaging three out of ten, with the worst pain being four to five. (*Id.*). Nurse Rice-Jacobs performed a physical examination, finding Claimant's skin on his lower extremities to be warm, pink and dry. Claimant demonstrated a non-antalgic gait and showed no sign of active RSD. (Tr. at 485). Claimant indicated a desire for an appointment with a psychologist and wanted to restart work conditioning. Dr. Ozturk requested authorization for psychological treatment evaluation, as well as a work hardening program. Claimant's diagnosis remained complex regional pain syndrome of the left foot.

On September 29, 2010, Claimant returned to CHH Pain Management with complaints of open sores on the left foot, pain at eight out of ten on the ten-point pain scale, and problems sleeping due to pain. (Tr. at 487-90). Claimant reported physical and overall function, mood, family relationships and sleep were worse since his last visit. (Tr. at 488). A physical examination revealed Claimant's gait was within normal limits, and he was able to walk without any assistance. He was observed sitting comfortably in no distress. (Tr. at 489). There was redness over the left ankle as well as three small areas on the dorsum of the left foot possibly representing skin folliculitis with some open sore area. However, there was no active bleeding or evidence of any discharge. Dr. Memon assessed

Claimant with plain folliculitis and cellulitis that was locally infected.

As far as the work hardening program, Dr. Memon documented that Claimant had attended two sessions, but began to miss appointments. (Tr. at 489). As a result, the physical therapist stopped treating Claimant, noting that he was not following through on treatment recommendations. Dr. Memon also indicated that Claimant had reported to Nurse Rice-Jacobs that he had been hospitalized due to suicidal thoughts after abruptly stopping Cymbalta; however, the hospital records did not substantiate that report. Instead, the records showed that Claimant had been to the Emergency Department on two occasions for breathing problems. (Tr. at 489). Dr. Memon wrote that Claimant had now reached maximum medical improvement, and there was no other treatment the CHH Pain Management Center could offer him except continuation of medications. Claimant was told to call for follow-up appointments (Tr. at 490).

Claimant returned to Cabell Huntington Hospital's Emergency Department on October 30, 2010 with complaints of right flank pain that began one week earlier. (Tr. at 566-602, 725-737). Claimant's affect and mood were noted to be appropriate. (Tr. at 568). He admitted to occasionally drinking a six-pack of beer and to a history of smoking marijuana. (Tr. at 586). A CT scan was performed, which showed the presence of a kidney stone in the right distal ureter. (Tr. at 569). Claimant was diagnosed with renal stone, ureteral stone, and urinary tract infection. (Tr. at 568). He was given Percocet for pain management. (Tr. at 569).

Claimant returned on November 4, 2010 with the same complaints, indicating that he had run out of Percocet. (Tr. at 532-63, 738-47). Claimant admitted to alcohol use, stating that he occasionally drank a six-pack of beer, and he admitted to marijuana use one month earlier. (Tr. at 548). Claimant was observed to be alert and oriented, with

appropriate affect and behavior. (Tr. at 550). A CT scan showed the presence of a 5mm stone in the distal right ureter. (Tr. at 563). Claimant was diagnosed with renal colic, given medications including Percocet, Hydromorphone, and Cymbalta, and was discharged home in stable condition. (Tr. at 536, 552-55).

On November 8, 2010, Claimant returned with complaints of nausea and vomiting due to a kidney stone. (Tr. at 497-531, 748-58). An abdominal x-ray was within normal limits with no evidence of kidney stones. Claimant's psychiatric condition was described as "cooperative, appropriate mood & affect." (Tr. at 501). He admitted to smoking marijuana in the past, with his last usage occurring approximately one month earlier, and to drinking a six-pack of beer occasionally. (Tr. at 517, 749) Claimant was diagnosed with a kidney stone that had passed. He was given hydromorphone by injection and intravenously for pain, as well as Percocet tablets. (Tr. at 523-25). Claimant was discharged home in stable condition. (Tr. at 502).

On November 27, 2010, Claimant was taken to St. Mary's Medical Center after the police were called to his home. Claimant stated that he had snorted Xanax and was having suicidal ideations. He became agitated and uncooperative with the police, so they transported him to the hospital for evaluation. (Tr. at 765-70). Upon arrival, Claimant was depressed, angry, and uncooperative. (Tr. at 765). Claimant's social history was positive for occasional use of alcohol and drugs. Claimant's mood was hostile and his affect threatening. However, Claimant was oriented to person, place and time. Claimant refused to undergo a physical examination, but laboratory tests were positive for benzodiazepines and cannabinoid. (Tr. at 799). Claimant was assessed with major depression, suicidal ideations, polysubstance drug use, and aggressive behavior. (Tr. at 766).

While at St. Mary's Medical Center, Claimant underwent pre-admission screening by a psychologist to evaluate him for involuntary hospitalization. (Tr. at 761, 771). The evaluator noted that Claimant had been off his medications for ten days and had not slept in six days. (Tr. at 784). Claimant had also admitted to smoking marijuana and drinking moonshine. (Tr. at 761). He had been living with his mother, but was now homeless because his mother had asked him to leave. (Tr. at 787). The evaluator documented that Claimant had a history of bipolar disorder and obsessive compulsive disorder, with suicidal and homicidal ideations, and probably was dependent on benzodiazepines. (Tr. at 784-8). Ultimately, a mental hygiene commissioner found no probable cause to believe that Claimant was addicted, but probable cause to believe he was mentally ill. (Tr. at 772). The commissioner further determined that Claimant was a danger to himself or others and ordered involuntary mental health hospitalization. (Tr. at 773-75). Claimant was transferred to River Park Hospital for further care. (Tr. at 762).

Upon arrival at River Park Hospital, Claimant was examined by Adam Pagett, M.D., and Charles Clements, M.D. (Tr. at 813-16). Claimant told the doctors that he had been involved in a bar fight with a couple of police officers, and they stomped on his foot, which was now quite painful. He indicated that he had not taken any pain medication for two weeks and needed "at least a Percocet 10." (Tr. at 813). Claimant also told the physicians that he had various chronic illnesses, such as diabetes and hypothyroidism, and had suffered a heart attack and stroke two years earlier, but did not seek treatment for them. He admitted to smoking two packs of cigarettes a day, abusing alcohol daily, and having a history of polysubstance abuse. (Tr. at 813).

During the examination, Claimant focused on his foot pain. His physical examination was unremarkable other than he displayed an odd gait in which he attempted

to keep weight off the left foot; however, the physicians later observed Claimant standing and walking in the hallway putting pressure on his left foot with no evidence of pain. (Tr. at 814-15). Examination of Claimant's left foot showed no erythema, swelling, or deformity. The physicians could not palpate the bones of the left foot or check pulses due to Claimant's complaints of pain. Claimant also claimed that he could not walk on his heels and toes due to pain, but the physicians noted that Claimant's gait was normal when he was not watching the physicians. (Tr. at 815). Claimant could hold both arms forward for twenty seconds. Pain, sensory, and light touch appeared intact in both hands and feet. The patellar tendon reflexes were two positive and equal. Claimant was assessed with mood disorder and polysubstance abuse. (Tr. at 815-16). The physicians did not feel that Claimant had any acute injury to his foot and prescribed ibuprofen. In light of Claimant's report that he took high doses of narcotics and benzodiazepines for chronic pain, the physicians decided to confirm the prescriptions with Claimant's treating physicians before dispensing any medications. (Tr. at 816).

According to the discharge summary, Claimant remained hospitalized at River Park Hospital until December 15, 2010. (Tr. at 809-12). During the admission, Claimant's attending physician was Dr. Philip Spangler. Dr. Spangler documented Claimant's hospital course beginning with his admission. He first reviewed the reasons for Claimant's involuntary hospitalization, adding that Claimant reported taking pain medications on a regular basis, as well as Xanax, indicating that he often self-medicated. Claimant also reported a history of psychosis and bipolar disorder. He described serving as a control commander for special missions in Vietnam and Iraq, which forced him to witness a lot of young men and children dying. Claimant asserted that he had multiple personalities and numerous health issues. Claimant advised Dr. Spangler that he had killed one person

that night and did not want to kill anyone else.

After the initial interview, Dr. Spangler spoke with Claimant's brother, who stated that Claimant had never served in Vietnam, although one of his brothers had done so. Claimant's brother indicated that Claimant made up stories, trying to take on the lives and personalities of his brothers. Claimant's brother felt Claimant's symptoms had worsened in the past five to six years. He reported that Claimant had a history of mental illness and had been hospitalized several times over the course of his life, beginning in childhood. Claimant's brother reported finding his brother in a bathtub ten days earlier with a gun in his mouth, but was able to get the gun away from him. (Tr. at 810). Claimant had additionally attempted suicide in the past by hanging himself.

On arrival to River Park Hospital, Claimant was observed to be extremely agitated with a dysphoric mood. He complained of insomnia for eight straight days and nights. Dr. Spangler opined that Claimant was abusing not only opiates, but also benzodiazepines. While in River Park, Claimant's mood responded well to Seroquel, and he tolerated detoxification. Upon discharge on December 15, 2010, Claimant was diagnosed with bipolar disorder, not otherwise specified; opiate dependence; and benzodiazepine dependence. (Tr. at 811). He received a GAF score of 65.[3] Discharge medications included Seroquel, Trazodone, Vistaril, Prilosec and Lyrica. Claimant was instructed to go to the

---

[3] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 34 (4th ed. text rev. 2000) ("DSM–IV*"*). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM–5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM–5 at 16. A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM–IV at 34.

Prestera Centers for Mental Health ("Prestera") the following day for outpatient therapy.

Two days later, on December 17, 2010, Claimant underwent a clinical evaluation at Prestera by Florence Wilburn, Licensed Professional Counselor, followed by a psychiatric evaluation by Dr. Nika Razavipour. (Tr. at 830-35, 845-49). Claimant informed Ms. Wilburn that he had been voluntarily admitted to River Park Hospital for suicidal and homicidal ideations. (Tr. at 834). Claimant stated that the hospitalization helped with his symptoms; however, he reported that he had not taken any of the medications prescribed for him by Dr. Spangler, because he was unable to pay for them. Consequently, his symptoms of anxiety and agitation had returned. (Tr. at 834, 845). Claimant expressed great concern about not being able to afford his medications and slipping back into his mental illness. He stated that he had been receiving workers' compensation until a month or so ago, but no longer had any source of income. Claimant reported childhood abuse and trauma, chronic depression, uncontrollable anger, intrusive thoughts, nightmares, and paranoia, all of which affected his self-care, relationships, social functioning, and concentration. Claimant also reported to Ms. Wilburn, that while at River Park, he had not shared any information about his childhood abuse to his mental health providers. Ms. Wilburn felt that this history tended to suggest post-traumatic stress disorder ("PTSD") as a possible diagnosis. Claimant's prior medical history included chronic pain, left foot injury, sleep disorders, and stomach issues. (Tr. at 846).

On examination, Ms. Wilburn found Claimant's appearance, speech, and thought content to be within normal limits. Claimant was oriented to person, place, situation, and time, but appeared withdrawn with a restricted affect. (Tr. at 841-42). Claimant demonstrated normal recall memory, but was deficient in coping skills. Ms. Wilburn assessed Claimant with chronic PTSD, mood disorder with questionable depressive

24

disorder versus bipolar disorder, and polysubstance abuse. She gave Claimant a GAF score of 45.[4] (Tr. at 835). Ms. Wilburn opined that Claimant's prognosis was guarded as he had limited support, limited means to access care, a history of alcohol and polysubstance abuse, and a long history of prior unsuccessful mental health treatment. (Tr. at 848). She believed it was important to quickly arrange for Claimant to receive the medications he had been prescribed by Dr. Spangler.

Following Ms. Wilburn's intake, Dr. Razavipour performed a psychiatric evaluation. (Tr. at 830-31). Dr. Razavipour reviewed the history of Claimant's recent hospital admission, his longstanding history of psychiatric issues, and his substance abuse. He noted that Claimant started drinking beer at age 15. He got drunk and had blackouts, resulting in three DUI's. Claimant admitted to having a beer the day prior to the appointment. (Tr. at 830). Regarding drug usage, Claimant stated that he began using OxyContin and Xanax approximately two years earlier after hurting his foot at work. He indicated that he last used Xanax three weeks ago and OxyContin two months ago. Claimant also reported that he had been off his psychiatric medications for two days.

Dr. Razavipour performed a mental status examination. (Tr. at 831). During the evaluation, Claimant made good eye contact, was cooperative, and demonstrated calm behavior. Claimant's mood was congruent and appropriate, although he expressed feeling anxious. Claimant's thoughts were goal-oriented; he was oriented to person, place and time; he demonstrated fair remote, recent, and immediate memory, and fair concentration and calculation. Claimant was of average intelligence with fair insight and judgment. (Tr. at 831). Dr. Razavipour diagnosed Claimant with PTSD; bipolar disorder,

---

[4] A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment.

most recent episode mixed; and polysubstance dependence (alcohol, opioids, benzodiazepines) in early full remission. His GAF score was 50. Claimant received prescriptions for Seroquel, Trazodone, and Vistaril and was told to return in three weeks; however, Claimant did not appear for his scheduled appointment on January 3, 2011. (Tr. at 844).

On January 12, 2011, Claimant returned to Prestera for reevaluation by Dr. Razavipour. (Tr. at 828). Claimant told Dr. Razavipour that Trazodone made him very groggy in the mornings so he stopped taking it; especially since he felt Seroquel was helping with his sleep issues. He denied mood swings. Claimant reported that he was residing with his mother and all his family felt he was doing much better. He had not been drinking alcohol or taking Xanax for approximately one month. Claimant also told Dr. Razavipour that Vistaril helped ease his anxiety. Claimant was advised to continue taking Seroquel and Vistaril; however, Trazodone was discontinued. At this visit, Claimant's GAF score had increased to 58.

Claimant next saw Dr. Razavipour on February 7, 2011 and then again on March 5, 2011. (Tr. at 901-03, 906). On February 7, Claimant complained of depression. He talked about having no motivation or interest in doing anything. Celexa was added to his medication regimen. On March 5, Claimant reported that Celexa seemed to be helping with his mood, but he was having trouble sleeping and could not sleep at all unless he took Seroquel. Dr. Razavipour continued Seroquel, increased Celexa, and reduced Vistaril.

Claimant continued to seek treatment with Dr. Razavipour and counselors at Prestera throughout the spring and summer of 2011. (Tr. at 907, 908, 957-79). On March 11, Claimant reported improved mood with a decrease in depression and anxiety. (Tr. at

907). On April 11, he reported a slight increase in anxiety; however, Counselor Billie Webb noted that Claimant appeared alert and attentive and was responding well to active listening. (Tr. at 908). On June 24, Ms. Webb counseled Claimant finding his appearance, speech, and thought content to be within normal limits although his affect and sociability were inhibited. (Tr. at 977-78). Claimant was oriented and demonstrated an improvement in coping skills. He received a GAF score of 65. Dr. Razavipour evaluated Claimant on June 27. (Tr. at 970). Claimant reported he felt angry and presented a constricted affect. He also complained of being nervous since his mother's recent death. Klonopin was added to his medication regimen. (Tr. at 971). On July 1, Claimant told Counselor Webb that his mother had recently died, causing him to feel more depressed; however, he believed he was "coping pretty good." (Tr. at 968). Claimant had been prescribed Klonopin, but was not taking the medication because he feared becoming dependent on it. On July 5, Counselor Webb recorded Claimant's current medication regimen showed some degree of efficacy although continued monitoring and/or adjustments would be required. (Tr. at 963). At this visit, Claimant's appearance, speech, thought content, and recall memory were within normal limits. (Tr. at 965-66). Claimant's affect was appropriate, and he demonstrated improved coping skills. His GAF score at this visit was 65. On July 21 and August 8, Claimant complained of increased isolation and a slight increase in depression related to his mother's death. (Tr. at 958-59). Claimant reported to Dr. Razavipour on August 12 that he had taken more than one Klonopin per day as he was having increased symptoms related to his mother's death. Dr. Razavipour documented that Claimant had applied for disability on the basis that he had poor concentration, poor memory, and anxiety. Dr. Razavipour discontinued Klonopin from Claimant's medication regimen at that time, but continued his other medications. (Tr. at 957).

27

On September 12, 2011, Claimant reported he had starting using marijuana three times a week and continued to increase his usage. (Tr. at 942, 948-49). Claimant reported he had been arrested for possession of controlled substances in 2010. (Tr. at 948-49). Claimant appeared obviously depressed, anxious and nervous. (Tr. at 955). Counselor Webb felt that due to a relapse, Claimant would require a different level of care which would include individual and group therapy. (Tr. at 940). Claimant agreed to recommended therapy and began treatment on September 29, 2011. (Tr. at 939).

Dr. Razavipour evaluated Claimant on October 14, 2011 in connection with his relapse. (Tr. at 938-39). Claimant told Dr. Razavipour he started using marijuana again after his mother died and believed he was trying to medicate himself due to depression. He had decided with the assistance of his therapist to start a substance abuse program. In addition to the medication protocol already in place, Dr. Razavipour increased Claimant's Remeron.

On October 20, 2011, Claimant presented to Jerrol Robinson, Family Nurse Practitioner ("FNP-BC"), at Valley Health, with complaints of stomach pain as well as emotional issues pertaining to his mother's death. (Tr. at 984-85). Claimant reported he was seeking treatment at Prestera and felt his psychiatric medications were "working well." A review of systems was negative. Claimant appeared in no acute distress and the physical examination was unremarkable. Claimant was prescribed Nexium and Pravacil. (Tr. at 985).

Claimant met with Counselor Sarah Long at Prestera on November 3 and November 9, 2011. (Tr. at 922-25). On both occasions, Claimant reported having smoked marijuana. On November 3, Claimant's affect was flat; however, his memory, gait, posture, thought process, concentration and speech were within normal limits. On

November 9, Claimant reported his mood was "better." (Tr. at 922). At both sessions, Claimant admitted he had not participated in community based 12 step meetings, stating that "once an addict, always an addict." (Tr. at 924). However, Claimant did state that his medications were working, and by November 9, he felt that they were effective in restricting his symptoms.

Claimant returned to Nurse Robinson at Valley Health on December 20, 2011, with complaints of foot pain and occasional chest pain. (Tr. at 982-83). Claimant told Nurse Robinson he had been informed by his physician in 2010 that he had reached maximum medical improvement regarding the injury he sustained in 2008 to his left foot. Upon examination, Claimant's heart rate and rhythm was normal. The feet were cool bilaterally without discoloration. There appeared to be equal capillary refill, although it was slightly delayed by approximately four to five seconds. The posterior, tibial, and dorsal pedalis pulses were present and equal bilaterally at +2. Nurse Robison did not detect any edema of either foot and range of motion of the toes, feet, and ankles was within normal limits. (Tr. at 983). Claimant was diagnosed with hyperlipidemia, chronic pain, and family history of cardiovascular disease. Claimant received a prescription for Gabapentin.

On January 10, 2012, Claimant was seen by Counselor Long at Prestera for the purpose of creating a crisis plan. (Tr. at 1019-20). Claimant reported that he now lived with his brother, who regularly used pain pills, alcohol, and marijuana. Consequently, Claimant had relapsed and was using all three substances. He had recently experienced a blackout from his substance abuse. Claimant further reported that he had considered shooting his brother and then himself. Claimant exhibited a flat affect, reported paranoia, and increased anxiety along with suicidal and homicidal ideations. However, Claimant appeared oriented to person, place and time. His memory, gait, posture, thought process,

concentration, and speech appeared within normal limits. Claimant described his mood as "okay, just anxious." (*Id.*). Claimant's brother was contacted and instructed to remove all guns and ammunition from the house. Claimant was advised to continue with a co-occurring intensive outpatient substance abuse treatment, as well as group and individual therapy, psychiatric evaluation, and medication management.

Claimant returned to Prestera on January 25, 2012 with continued intense paranoia, homicidal ideations towards the public, and intermittent suicidal ideations. (Tr. at 1009-18). Claimant's memory, gait, posture, thought process, concentration, eye contact, speech and judgment appeared to be within normal limits. (Tr. at 1009). Claimant was evaluated by Deborah Finley of the Crisis Residential Unit ("CRU"). Claimant reported feeling helpless, along with low energy, anxiety, insomnia, social withdrawal, impaired attention and concentration. He also reported paranoia, suspicious thinking, anger control issues, and labile moods including homicidal thoughts pertaining to his brother. Claimant's behavior was noted to be impulsive and maladaptive. (Tr. at 1014). He demonstrated a blunted affect and deficient coping skills although his appearance, speech and thought content appeared within normal limits. (Tr. at 1015-16). Claimant was diagnosed with schizophrenia, paranoid type, and given a GAF score of 30.[5] Claimant was admitted to the crisis unit.

The following day, Dr. Matin Khan, the attending psychiatrist, examined Claimant and diagnosed him with bipolar disorder, mixed, and opioid and marijuana abuse. (Tr. at 1008). Dr. Khan concurred with Ms. Finley's GAF score of 30. (Tr. at 1007-08). Two days

---

[5] A GAF score of 21-30 reflects that "behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g. sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g. stays in bed all day, no job, home, or friends). DSM-IV at 32

later, on January 27, Claimant requested discharge from the unit. (Tr. at 1005). When examined by Nurse Washington and Counselor Fitzwater, Claimant appeared cooperative and oriented to person, place, time and situation; however, he remained depressed, paranoid, and suspicious of others. Claimant reported that his medications were no longer effective and, therefore, he had been self-medicating with various controlled substances. Claimant was discharged home and advised to return on February 1.

Claimant returned to Prestera on February 1, 2012 for a psychological evaluation by Dr. Claire Belgrave, another attending psychiatrist. (Tr. at 1001-02). Claimant admitted to using benzodiazepines one month earlier and smoking marijuana the day prior. (Tr. at 1001). He had also used alcohol and narcotics recently. Claimant was diagnosed with polysubstance abuse, bipolar disorder, and PTSD. He received a GAF score of 50. Claimant was provided prescriptions for Seroquel, Celexa, and Remeron. (Tr. at 1003).

That same day, Claimant presented to Christopher Adams, M.D., at University Cardiovascular Services, for complaints of intermittent chest pain upon exertion with occasional radiation to the left arm that had been occurring for the past eight years. (Tr. at 1034-37). Claimant told Dr. Adams that he could walk a distance of one mile; however, this caused him to perspire heavily and develop shortness of breath. Claimant's current medication regimen included Citalopram, Remeron, Metformin, Neurontin, Dexilant, Seroquel, and Prevastatin. (Tr. at 1034). A physical examination was normal. Claimant was assessed with chest pain and hyperlipidemia. Due to the described atypical pain, coupled with risk factors and persistent symptoms, a heart catheterization and EKG were scheduled. (Tr. at 1037).

On February 2, 2012, Claimant returned to Nurse Robison for review of blood

31

sugar measurements which had remained in the mid three hundred to four hundred range. Claimant complained of fatigue and questioned its relation to diabetes mellitus versus depression. Claimant's physical examination was normal; however, his blood sugar was high. Claimant was diagnosed with Type 2 diabetes mellitus, uncomplicated and uncontrolled. Claimant's medication regimen was adjusted with an increase in Metformin. (Tr. at 981).

On February 7, 2012, Claimant presented to Counselor Sarah Long at Prestera. (Tr. at 991-99). Claimant appeared withdrawn, demonstrating a flat affect and deficient coping skills; however, his appearance, speech, and thought content were within normal limits, and he demonstrated normal recall memory. (Tr. at 996-97). Counselor Long did not determine a diagnosis at this visit but noted that Claimant was receiving treatment for mental health issues, substance abuse, psychological distress, maladaptive and antisocial behaviors, anxiety, paranoia, and night time auditory hallucinations.

On February 10, 2012, Claimant underwent a left heart catheterization, left ventriculogram, and selective right and left coronary angiography at St. Mary's Medical Center. (Tr. at 1028-29). The procedures revealed significant disease of the first obtuse marginal branch of the circumflex artery with a Promus Element 3.5 12mm stent, nominal disease of the rest of the coronary arteries, preserved left ventricular function and normal hemodynamics. Claimant was advised to take Plavix for one year and aspirin indefinitely. (Tr. at 1029).

From March 2012 through August 2012, Claimant sought treatment with a physician and counselor at Prestera, including eight visits with Dr. Belgrave. (Tr. at 987, 1021, 1023, 1162-72, 1174-78). He complained of not doing well and of having sleep issues and anxiety. He also expressed a desire to begin taking Seroquel again. Objectively,

Claimant appeared paranoid, with a constricted affect, but was clean and sober. (*Id.*).

On September 5, 2012, Claimant reported suicidal thoughts to Dr. Belgrave. (Tr. at 1134). Dr. Belgrave felt Claimant needed hospitalization and contacted the Crisis Residential Unit. Claimant was admitted to the Crisis Residential Unit and underwent evaluation by Counselor Deborah Finley. (Tr. at 1135-60). Claimant told her he was depressed, suicidal, and had a plan to use a gun. Claimant complained of depressed mood, low energy, anxiety, insomnia, social withdrawal, impaired attention and concentration. He was stressed by a recent denial of disability, grief from his mother's passing, and financial problems. Counselor Finley noted Claimant had a long history of mental illness and was currently unable to maintain relationships or be motivated to complete activities of daily living due to his symptoms. Claimant had also demonstrated impulsive and maladaptive behavior. (Tr. at 1135). During this evaluation, Claimant was oriented to person, place, situation, and time; his speech, thought content, and motor activity were within normal limits; and his recall memory was also normal. Although he presented an appropriate affect, he was socially withdrawn and demonstrated deficient coping skills. (Tr. at 1136-37). Claimant received a GAF score of 30. (Tr. at 1138).

Claimant was examined by Dr. Khan at Prestera the following day. (Tr. at 1132-33). Claimant reported that he was feeling depressed. Dr. Khan indicated that Claimant was on a number of medications, and confirmed that he was taking all of them except Celexa. A mental status examination reflected that Claimant had normal thought content and motor behavior, although his thought processes revealed paranoia. He appeared depressed and anxious, with an intact memory and fair concentration. Claimant was diagnosed with major depression, severe and recurrent, with psychotic features. Claimant's prognosis was fair with treatment. Dr. Khan felt Claimant needed his

medications adjusted and counseling. (Tr. at 1130). On September 8, Dr. Khan noted that Claimant reported feeling better with no side effects from the prescribed medication. Dr. Khan felt Claimant was slowly improving. (Tr. at 1130). Claimant continued to show improvement on September 9 and September 10, with good sleep and appetite and no side effects from his medication. (Tr. at 1128-29). By September 11, Claimant reported to Dr. Khan that he felt fine, with good sleep and appetite. (Tr. at 1125-27). Dr. Khan noted that Claimant's symptoms were fairly well-controlled with medication, and he could be discharged. Consequently, Claimant was discharged from the crisis unit that day with a prescription for medications and a follow-up appointment with Dr. Belgrave. (Tr. at 1126-27). Claimant followed-up with his therapist on September 14, 2012, reporting that he was doing "good" since his release. He was taking his medications as prescribed and felt there were at the correct dosages. (Tr. at 1114).

On October 3, 2012, Claimant saw Dr. Belgrave as scheduled. (Tr. at 1111-13). Dr. Belgrave reviewed Claimant's history of substance abuse and mood instability, noting that Claimant had recently been admitted to the Crisis Unit. She performed a mental status examination, documenting that Claimant was cooperative and his behavior was normal. (Tr. at 1111). Claimant had no current suicidal or homicidal ideations, but was paranoid. He was alert and oriented in all three spheres, and his thought process was linear. Claimant appeared anxious, but had fair memory, concentration, and calculation. (Tr. at 1112). Claimant was diagnosed with PTSD and substance abuse in early remission. His GAF score was 55.

Christopher Adams, M.D., examined Claimant on October 31, 2012 for complaints of chest pain with racing heart; however, the pain did not radiate nor did Claimant experience any palpitations or lightheadedness. (Tr. at 1187-91). Claimant reported he

smoked, chewed tobacco and drank alcohol. (Tr. at 1188). Claimant's physical examination was normal. Dr. Adams noted Claimant's mood and affect were normal. (Tr. at 1189). Claimant was diagnosed with hyperlipidemia, atherosclerosis, and chest pain. He was advised to take aspirin along with Clopidogrel Bisulfate. A cardiovascular stress test and EKG was ordered. (Tr. at 1190).

Claimant presented to University Cardiovascular Services on November 6, 2012 for a myocardial perfusion study. (Tr. at 1184-85). The attending physician found there were no changes on the stress ECG and there were no stress arrhythmias. The myocardial perfusion study was normal.

Claimant returned to Prestera on November 8, 2012 for follow-up with Dr. Belgrave. (Tr. at 1197). Claimant reported at that time that he was doing okay, and he had no suicidal, homicidal or psychotic thoughts. Claimant's affect was constricted and he was slightly anxious, but he was alert. Dr. Belgrave continued Claimant's medications and told him to return in one month. (Tr. at 1197-98).

On December 5, 2012, Claimant returned to Dr. Adams reporting he was doing well with no further chest pain, shortness of breath, paroxysmal nocturnal dyspnea, orthopnea or edema. (Tr. at 1179-82). Claimant was compliant with his medications theorizing to Dr. Adams he felt the chest pain was related to his anxiety. A physical examination was normal. (Tr. at 1181). Claimant was oriented to person, place, and time and demonstrated a normal mood and affect. He was diagnosed with atherosclerosis, hyperlipidemia and chest pain. Claimant was advised to continue his medication regimen of aspirin, Plavix, Lisinopril and Prevastatin. (Tr. at 1182).

Claimant returned to Prestera on December 5 and December 14, 2012 and saw Dr. Mohit Bhardwaj. (Tr. at 1292-96). On December 5, Dr. Bhardwaj noted that Claimant had

not abused substances for the past eight months. He appeared cooperative with normal eye contact and motor activity although his affect was constricted. He received a GAF score of 50. (Tr. at 1194, 1196). On December 14, Counselor Hickman recorded that Claimant showed good insight by acknowledging that his self-imposed isolation had an adverse impact on his anxiety and depression. (Tr. at 1192).

Claimant returned to Prestera on January 30, 2013 with complaints of increased sadness and paranoia. He stated that he did not like to be around people and isolated himself. (Tr. at 1263-67). His GAF score remained unchanged, and he was instructed to continue with medications. (Tr. at 1263, 1266). From February 2013 through May 2013, Claimant showed good insight and remained drug free. (Tr. at 1248-62). On February 19, 2013, Claimant stated that his medications were helping to alleviate his symptoms. He showed good insight about the affect his isolating behaviors had on his depression. (Tr. at 1262). On March 20, Claimant reported his mood was much better and although he continued to feel very paranoid and found it hard to be with people, he had remained sober for one year, denying any hallucinations, suicidal or homicidal ideations. (Tr. at 1257). Two days later, Claimant complained of constant depression and anxiety. He also experienced social anxiety, which caused him to isolate. (Tr. at 1255).  Claimant admitted to suicidal thoughts, but had no plan or means. He reported being substance free for "over a year" and felt no urge to relapse. (*Id.*). He still experienced social anxiety and was not attending any 12-step program. On May 1, Claimant complained of problems falling and remaining asleep. His mood continued to be fine and he reported that Vistaril helped ease his anxiety. (Tr. at 1249). Dr. Bhardwaj documented that Claimant had been sober for over a year, but still felt very paranoid and had trouble being around other people. (*Id.*). On May 24, Claimant expressed concern about his living arrangements. He had nine

36

siblings and they were helping him, but they all had mental health issues. (Tr. at 1248). He admitted to having constant suicidal thoughts, although he had no plan to act on them. Claimant expressed feeling hopeless because he had been denied SSI benefits and did not believe that he could work given his psychological condition. (*Id.*).

Claimant returned to Dr. Adams on June 5, 2013 with complaints of chest pain described as pressure and a burning sensation. (Tr. at 1077-81). Dr. Adams noted Claimant had been doing well since his last visit, but had run out of Plavix and aspirin. Claimant's physical examination was normal. His mood and affect were noted as normal. Claimant's diagnosis remained unchanged. Claimant returned for follow-up one week later on June 12, reporting that his chest pain had stopped, his heart rate remained controlled, and he had no issues with medication. Claimant also stated that he was doing well. Claimant continued to demonstrate a normal mood and affect. His physical examination was also normal. Claimant was advised to continue his medication regimen.

Beginning June 12, 2013 through November 20, 2013, Claimant received treatment at Prestera on fourteen occasions. (1199-1202, 1204-1211, 1213-47). On June 12, his main complaint was anxiety although his mood and energy were fine. (Tr. at 1242). On June 24, Claimant reported he was "about the same." He had not used substances for one and one half years, but continued to be very depressed. (Tr. at 1241). On July 1, the counselor noted that Claimant's affect and verbal report were incongruent. He stated that he was very happy his children were visiting him, but he maintained a flat affect regardless of the topic of conversation. Counselor Williams questioned the need for all the medications Claimant was being prescribed as they might be causing further depression. (Tr. at 1240). On July 12, Claimant reported he felt "a lot better." He had enjoyed spending time with his children, was walking, going to church with his girlfriend, and practicing

thinking happy thoughts. (Tr. at 1239). On July 17, Claimant's mood and energy were fine. Claimant reported Klonopin helped with anxiety but tended to wear off after five hours. He stated, however, that he was starting to enjoy life, attended church, and watched television. (Tr. at 1233). Claimant received prescriptions for Klonopin and Ambien. (Tr. at 1237-38). On July 26, Claimant told Counselor Williams he was doing well but was slightly sad as his visit with his children was over. Claimant was adjusting well to Klonopin and Ambien, sleeping eight hours a night, doing light housework, and moderate yard work. His affect, eye contact, skin color and self-care were all described as good. (Tr. at 1232). On August 2, Claimant was ill with stomach issues, and reported that he was tired and lacked motivation. Claimant had recently been prescribed testosterone and Vitamins B, C, and D to improve his energy level and immune system. Claimant had no income and was being supported by his family and public assistance. (Tr. at 1231). On August 28, Claimant's chief complaint was anxiety although his mood was fine. (Tr. at 1224). His mental status examination was normal. (Tr. at 1224-25). On September 13, Claimant reported increased depression, lack of motivation, negative thoughts, and suicidal thoughts without intent. He was worried about his feet, which he believed were swollen due to his diabetes; however, he actually had ingrown toenails. (Tr. at 1223). On September 19, Claimant presented a normal appearance, exhibiting normal thought content although his sociability was inhibited. (Tr. at 1213-22). Claimant was overwhelmed and exhibited a flat affect. On October 9, Claimant felt he had not had any significant changes since his last visit. (Tr. at 1211). He complained of lack of motivation at times and restlessness at times which caused the counselor to opine this might be due to the number of medications he was taking. (Tr. at 1211). Dr. Bhardwaj decided to discontinue Ambien from the medication regimen and include Klonopin. (Tr. at 1209). At

this visit, Claimant's main issue was anxiety. His medication regimen included Klonopin, Vistaril, Cogentin, Resperidone, Remeron, Metformin, Plavix, Aspirin, Lisinopril, Dexilant, Pravastatin, Neurontin and Celexa. (Tr. at 1207). On October 10, at his request, Claimant was discharged from his current program and changed to a different one. He was noted to have been sober for over a year and no longer wanted substance abuse therapy. Claimant was diagnosed with schizophrenia and chronic depression. (Tr. at 1205).

Claimant met with Counselor Sandra Farrar on November 15 reporting he was "doing better" in regard to anxiety although he continued to feel social anxiety. (Tr. at 1204). On November 20, Claimant reported problems sleeping along with nighttime anxiety. However, he told the counselor he now had a girlfriend and would be celebrating Thanksgiving with her and her family. (Tr. at 1199). Claimant's mood was fine; his affect was appropriate; his speech was normal; and his thought processes and content were goal-directed and appropriate. (Tr. at 1199-1200). Claimant was advised to continue his medication regimen. (Tr. at 1201).

On January 2, 2014, Claimant was seen by Dr. Bhardwaj at Prestera who noted that Claimant was maintaining his baseline. (Tr. at 1275-78). Claimant still heard "minimal voices" but was able to ignore them. He continued to feel paranoid, but stated that he had a girlfriend now and was able to enjoy time with her. Claimant's mood was fine; his affect appropriate; he was alert and his thoughts were goal-directed. Claimant was advised to continue medication and therapy. (Tr. at 1277). He was diagnosed with substance induced mood disorder, rule out psychosis, and rule out schizoaffective disorder. Claimant maintained a GAF score of 50.

Claimant returned to Prestera on February 27, 2014 for examination by Dr.

Bhardwaj. (Tr. at 1279-82). At this visit, Claimant's medication included Klonopin, Risperidone, Remeron, Celexa, Metformin, Plavix, Aspirin, Lisinopril, Dexilant, Pravastatin, and Neurontin. Claimant was noted to be at his baseline, exhibiting normal mood, energy, and interest. A mental status examination reflected that Claimant was cooperative but guarded. His eye contact and motor activity was within normal limits. His affect was appropriate as was his thought content. Claimant had no hallucinations and demonstrated goal-directed thought processes. He did not demonstrate any suicidal or homicidal ideations. Claimant's diagnosis and GAF score remained unchanged.

On April 2, 2014, Claimant presented to St. Mary's Medical Center's Emergency Room in Ironton, Ohio after reportedly taking a combination of medications in an attempt to commit suicide due to depression. (Tr. at 1082-86). Claimant reported depression and stated that he did not want "to live anymore." Claimant's physical examination was normal, although he was drowsy. He appeared alert and oriented to person, place, and time and demonstrated normal speech. (Tr. at 1083). A toxicology screen was positive for cannabis and benzodiazepines. (Tr. at 1084). Claimant was admitted to the intermediate care unit. (Tr. at 1084-85).

### B. Evaluations and Opinions

On February 14, 2011, Cherie Zeigler, M.A., completed a clinical interview and mental status examination of Claimant at the request of the West Virginia Disability Determination Service ("DDS"). (Tr. at 850-56). Claimant informed Ms. Zeigler that he did not drive and had been brought to the appointment by his brother. (Tr. at 850). When asked about his personal history, Claimant stated that he was one of eight children raised primarily by his mother. He left home at thirteen years of age to live with an older woman with whom he had an intimate relationship. (Tr. at 851). He stayed with the woman until

40

graduating from high school. After high school, he moved to Florida and supported himself by painting cars. He returned to West Virginia about six years earlier and worked painting cars and at a power plant until he suffered a work-related injury. Claimant complained of having memory problems, fainting, depression, anxiety, schizophrenia, manic depression, history of kidney stones, chronic left foot pain, and bipolar disorder. Claimant reported a history of mental health issues in addition to a long history of substance abuse. He indicated that he became alcohol dependent at 15 years of age and continued to be dependent until age 29, when he stopped drinking for about ten years. However, he relapsed and also began using marijuana, pain pills, and Xanax. (Tr. at 853). Claimant told Ms. Zeigler that he self-medicated by using Xanax and Ambien, and a toxicology screen from a recent hospitalization confirmed positive results for marijuana and benzodiazepines. (Tr. at 852). Ms. Ziegler noted that Claimant had also experienced seizure-like activity in the past when withdrawing from benzodiazepine use, and his detoxification from those substances was a slow process.

Claimant reviewed his history of mental health admissions dating back to his childhood. He described two hospitalizations for mental health treatment, including one in Georgia in 2004 and a recent admission to River Park Hospital in Huntington. Claimant reported that he currently received outpatient mental health treatment at Prestera. Claimant stated that, at present, he lived with his mother who was disabled. His activities of daily living included doing laundry, vacuuming, making simple meals, and watching television.  (Tr. at 854). He watched television for leisure and socialized only with family members.

Ms. Ziegler performed a mental status examination of Claimant. (*Id.*). He presented with good personal hygiene and was cooperative and attentive throughout the

clinical interview. Claimant had normal speech, mood, affect, psychomotor activity, thought processes, thought content, and perception. However, his insight and judgment were poor. While Claimant's immediate memory was within normal limits, his recent memory was severely deficient, and his remote memory was mildly deficient. Claimant's concentration, persistence, and pace were judged to be within normal limits, but his social functioning was mildly deficient. Ms. Zeigler observed throughout the interview that Claimant never smiled or showed any lightness in mood; he made no pleasantries; and he was perfunctory and to the point. (Tr. at 854).

Based upon her interview and examination, Ms. Zeigler diagnosed Claimant with PTSD, by history; bipolar disorder, not otherwise specified, by history; and polysubstance dependence, in early full remission. (Tr. at 855). She felt Claimant's prognosis was fair in light of his efforts to receive outpatient treatment for mental health issues. In addition, he appeared stable during the period of her contact with him.

On March 4, 2011, Rabah Boukhemis, M.D., completed a Physical Residual Functional Capacity Assessment, documenting Claimant's primary diagnosis to be foot fracture and his secondary diagnosis to be regional pain syndrome. (Tr. at 865-72). Dr. Boukhemis found Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; and had limited ability to push and/or pull in the lower extremities. Dr. Boukhemis believed Claimant was limited to occasional use of foot controls due to his left foot injury. (Tr. at 866). In regard to postural limitations, Claimant could frequently balance and stoop, occasionally climb ramps or stairs, crouch, and kneel; however, he could never climb ladders, ropes or scaffolds, or crawl. (Tr. at 867). Claimant had no manipulative, visual, or communicative limitations.

(Tr. at 868-69). With respect to environmental limitations, Claimant could tolerate unlimited exposure to noise, but needed to avoid concentrated exposure to extreme cold or heat, wetness, humidity, vibration and fumes, odors, dusts, gases and poor ventilation. He also should avoid all exposure to hazards such as machinery and heights. (Tr. at 869). Dr. Boukhemis found Claimant's statements of disability to be only partially credible, noting that a CT scan revealed healed foot fractures, and he had been told to return to work after he completed a work hardening program. (Tr. at 872). On May 6, 2011, Thomas Lauderman, D.O. completed a Case Analysis and confirmed, as written, the March 4, 2011 Physical Residual Functional Capacity Assessment prepared by Rabah Boukhemis, M.D. (Tr. at 910).

On March 5, 2011, Holly Cloonan, Ph.D., completed a Psychiatric Review Technique. (Tr. at 873-86). Dr. Cloonan indicated that a mental residual functional capacity assessment would be necessary. She found Claimant to have evidence of affective disorder (disturbance of mood, accompanied by a full or partial manic or depressive syndrome and bipolar syndrome), (Tr. at 873, 876), an anxiety-related disorder (anxiety as the predominant disturbance, recurrent and intrusive recollections of a traumatic experience which are a source of marked distress), (Tr. at 873, 878), and a substance addiction disorder, (polysubstance dependence, in early full remission). (Tr. at 873, 881). She assessed the severity of Claimant's mental limitations under the paragraph B criteria, opining that Claimant was moderately restricted in performing activities of daily living, in maintaining social function, and in maintaining concentration, persistence or pace. She felt that Claimant had experienced one or two episodes of decompensation of extended duration. (Tr. at 883). Dr. Cloonan found no evidence that paragraph C criteria was present. (Tr. at 884).

Dr. Cloonan believed that Claimant's statements regarding mental limitations were credible based upon the consistency of his reports and complaints to multiple medical sources. In addition, Claimant had a recent hospitalization wherein he was diagnosed with polysubstance dependence; however, even when he was drug free, he continued to have moderate levels of impairment in all domains, socialized only with family, and was moderately dependent on others to perform household chores, prepare meals, and manage finances.  (Tr. at 885).

On the same date, Dr. Cloonan completed a Mental Residual Functional Capacity Assessment form. (Tr. at 887-89). Dr. Cloonan found that Claimant was not significantly limited in his ability to understand and remember very short and simple instructions, but was moderately limited in his ability to remember locations and work-like procedures and understand and remember detailed instructions. Claimant was not significantly limited in his ability to carry out very short, simple instructions, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, or make simple work-related decisions. However, he was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal work day and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*). Dr. Cloonan did not find Claimant to be significantly limited in his ability to ask simple questions or request assistance, accept instructions, respond appropriately to criticism from supervisors, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. On the other hand, he was moderately limited in

44

his ability to interact appropriately with the general public and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Finally, Dr. Cloonan found Claimant not to be significantly limited in his ability to be aware of normal hazards, take appropriate precautions, set realistic goals, and make plans independently of others; but, he was moderately limited in his ability to respond appropriately to changes in the work setting and travel in unfamiliar places or use public transportation. (Tr. at 887-88). In summary, Dr. Cloonan opined that Claimant had moderate limitations associated with his mental condition. Nevertheless, he was still able to learn and perform repetitive work-like activities in a low stress setting with limited interactions with others. (Tr. at 889). On May 6, 2011, Bob Marinelli, Ed.D. completed a Case Analysis and confirmed Dr. Cloonan's reports as written. (Tr. at 911).

On June 26, 2012, Dr. Belgrave completed a Mental Status Statement of Ability to do Work-Related Activities (Mental) on a form provided by Prestera. (Tr. at 918-21). Using designated DSM-IV codes, Dr. Belgrave diagnosed Claimant with drug dependence excluding opioid type drug; PTSD; and major affective disorder—bipolar disorder. She gave Claimant a GAF score of 50, which was his highest score in the past year. (Tr. at 918). Dr. Belgrave opined that the severity and chronicity of Claimant's psychological illness prevented him from being able to work, and his prognosis was guarded. On a function-by-function assessment, Dr. Belgrave opined that Claimant was unable to perform any work-related activities. (Tr. at 919). She identified Claimant's symptoms to include thoughts of suicide, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience, persistent disturbances of mood or affect, bipolar syndrome with a history of both manic and depressive syndromes and deeply ingrained, maladaptive patterns of behavior, all of which she believed were of moderate severity. She

also found Claimant to be markedly affected by feelings of guilt or worthlessness and generalized persistent anxiety. Dr. Belgrave opined that Claimant's mental health impairments would cause him to be absent from work five or more days per month. She added that Claimant's history of childhood abuse had a major impact on his illness, including his substance abuse. (Tr. at 920-21).

In response to a request by the ALJ, on March 13, 2014, Stuart Gitlow, M.D., M.P.H., prepared a letter summarizing his review of Claimant's mental health records from 2009 through 2014 and also completed Medical Interrogatories and a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. at 1056-69). According to Dr. Gitlow, who was a specialist in addiction and forensic psychiatry, Claimant's records revealed positive toxicology for marijuana in the context of an individual who had been diagnosed with addictive disease. Consequently, Claimant had not established that he suffered from a primary mental illness. To corroborate the existence of a primary mental illness, the DSM-IV and 5 required psychiatric symptoms to be present during periods of abstinence. Otherwise, the symptoms could be explained by the effects of substance abuse, rather than a primary mental illness. Dr. Gitlow acknowledged that Claimant showed mild difficulties with social and cognitive function on testing, but was unsure if the testing was performed during a period of abstinence. In any event, regardless of whether or not substance abuse was material in Claimant's case, Dr. Gitlow opined that Claimant did not meeting a listed mental impairment. (Tr. at 1056).

In response to the written interrogatories, Dr. Gitlow found that Claimant had no restrictions of daily living or repeated episodes of decompensation; however, Claimant did have mild limitations in maintaining social function, concentration, persistence, and

pace. (Tr. at 1058-62). Dr. Gitlow opined that Claimant's impairments did not meet or medically equal the criteria for any impairment described in the Listing of impairments, including paragraph "C" criteria. In the Medical Source Statement of Ability to do Work-Related Activities, using the criteria of non-drug and/or alcohol addiction or abuse, Dr. Gitlow found Claimant had no limitations in his ability to understand, remember, or carry out instructions, and no limitations in his ability to interact appropriately with supervision, co-workers, and the public, or respond to changes in the routine work setting. (Tr. at 1067-69). In contrast, Dr. Gitlow found Claimant could not manage benefits in his own best interest. When using the criteria of drug and/or alcohol use or abuse, Claimant was found mildly limited in his ability to understand, remember, and carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, supervisors or co-workers, and respond appropriately to usual work situations and to changes in the routine work setting.  (Tr. at 1063-65). Using this criteria, Dr. Gitlow again found Claimant unable to manage benefits in his own best interest.

On April 11, 2014, Dr. Bhardwaj completed a Mental Status Statement of Ability to do Work-Related Activities (Mental) on a Prestera form. (Tr. at 1285-88). Dr. Bhardwaj opined that Claimant's mental impairments and associated symptoms were very severe and had a poor prognosis. Dr. Bhardwaj opined that Claimant had mild limitations in understanding and remembering simple instructions; moderate limitations in carrying out simple instructions; and marked limitations in the ability to make judgments on simple work-related decisions and to understand, remember, and carry out complex instructions. He found Claimant to have extreme limitations in making judgments on complex work-related decisions; in interacting appropriately with the public, supervisors

47

and co-workers; and in responding appropriately to usual work situations and to changes in the work settings. As for Claimant's symptoms, Dr. Bhardwaj opined that Claimant was mildly affected by feelings of guilt or worthlessness; was mildly impaired in impulse control; had mild pathological dependence, passivity, aggression, and illogical thinking; had mild oddities of thought, perception, speech or behavior; and had some recurrent and severe panic attacks. Claimant also had moderate symptoms of appetite disturbance with weight change; paranoid thinking or inappropriate suspiciousness; perceptual or thinking disturbances; hallucinations or delusions, loosening of associations; pathologically inappropriate suspiciousness or hostility; memory impairment; and sleep disturbance. Claimant had marked symptoms of pervasive loss of interest in almost all activities; decreased energy; poverty of content of speech; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; psychomotor agitation or retardation; persistent disturbances of mood or affect; and apprehensive expectation. Claimant had extreme symptoms of blunt, flat, or inappropriate affect. Dr. Bhardwaj believed Claimant's mental impairments would cause him to be absent from work five or more days per month. (Tr. at 1287). Dr. Bhardwaj opined that Claimant's psychological illnesses included alcohol and/or substance abuse which contributed to his functional limitations, but emphasized that even when Claimant remained "sober for a while", his mental illness persisted. (Tr. at 1288).

On December 23, 2014, Dr. Gitlow responded to Medical Interrogatories posed by the ALJ and provided an updated opinion based upon new records supplied by the ALJ. (Tr. at 1306-19). In his supplemental letter, Dr. Gitlow reviewed the additional records, pointing out that in April 2014, Claimant's treating psychiatrist documented that Claimant had been "sober for a while" when, in fact, a drug test performed just a few days

earlier had positive results. Dr. Gitlow added that the new records continued to demonstrate "the presence of marijuana with no established periods of sobriety." (Tr. at 1307). For this reason, Dr. Gitlow opined that the records did not substantiate the presence of any primary psychiatric illness. In addition, Dr. Gitlow noted that Claimant was receiving addictive medication, "only muddying the waters further given the lack of any apparent indication for ongoing use of this class of medication (Klonopin specifically in this case)." (*Id.*). Aside from the April 2014 decompensatory episode reflected in the notes from St. Mary's Emergency Room in Ironton, Dr. Gitlow felt that Claimant's records did not reveal significant psychological impairment. (Tr. at 1307). In response to the interrogatories, Dr. Gitlow found that Claimant had no restrictions of activities of daily living or difficulties maintaining concentration, persistence or pace; however, Claimant had mild limitations with maintaining social function. Dr. Gitlow also found mild repeated episodes of decompensation, each of extended deterioration, but indicated that there was no evidence of paragraph C criteria and opined that Claimant's impairments did not meet or equal any listed impairment.

Once again, Dr. Gitlow used the criteria of drug and/or alcohol use and abuse ("DDA") for one Medical Source Statement and a companion statement excluding drug and/or alcohol use and abuse. (Tr. at 1313-19). Using DDA criteria, he found that Claimant had no limitations in understanding, remembering or carrying out simple instructions, or in the ability to make judgments on simple work-related decisions. Claimant had mild limitations in understanding, remembering and carrying out complex instructions, and in making judgments on complex work-related decisions. Claimant had no limitations interacting appropriately with the public, but had mild limitations interacting appropriately with supervisors and co-workers and responding appropriately to usual

work situations and to changes in a routine work setting. Dr. Gitlow's opinion on Claimant's ability to manage benefits in his own best interest remained unchanged. (Tr. at 1313-15). Without the DDA criteria, Dr. Gitlow opined that Claimant had no limitations in understanding, remembering or carrying out simple or complex instructions, nor did Claimant have any limitations working appropriately with supervisors, co-workers or the public, or responding to changes in the routine work setting. On this report, Dr. Gitlow did not give any opinion as to Claimant's ability to manage benefits in his own best interest. (Tr. at 1317-19)

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with

such decision." *Blalock*, 483 F.2d at 775.

**VII.** **<u>Discussion</u>**

> **A. RFC and Hypothetical Question**

Claimant first argues that the testimony of the vocational expert, identifying jobs that Claimant could perform, was unreliable because it was based upon an inaccurate hypothetical question. Claimant alleges that the ALJ found him capable of standing or walking only two hours out of an eight-hour workday. However, the hypothetical question posed to the vocational expert asked the expert to assume that Claimant could stand or walk a total of four hours in an eight-hour workday. Consequently, the vocational expert's testimony was not in response to an accurate hypothetical scenario.

Examining the RFC finding against the hypothetical question, the undersigned disagrees with Claimant's contention. In fact, the ALJ found that Claimant had the residual functional capacity to stand or walk a maximum of four hours in an eight-hour workday, and the hypothetical question tracked the ALJ's RFC finding. (Tr. at 14, 74). Accordingly, no inconsistency existed between the RFC finding and the hypothetical question, and the testimony of the vocational expert was based on Claimant's limitations as reflected in the RFC finding.

Nevertheless, the vocational expert's opinions may still be flawed, because the court is unable to determine whether substantial evidence supports the ALJ's finding that Claimant was capable of standing or walking a maximum of four hours in an eight-hour workday. In determining Claimant's RFC, the ALJ relied heavily on Dr. Boukhemis's opinion regarding Claimant's ability to stand or walk. However, as is clearly reflected in the record, a key disagreement over the interpretation of Dr. Boukhemis's opinion is present in the record. The ALJ failed to resolve that disagreement, leaving an important

question about the validity of her interpretation. The ALJ's error to resolve the conflict may have been rectified if she had otherwise provided a clear explanation of her rationale for finding Claimant capable of standing or walking for a maximum of four hours; however, the ALJ did not do so. As a result, the evidentiary support for the ALJ's RFC finding—at least with respect to Claimant's ability to stand or walk—cannot be properly evaluated.

In the decision, the ALJ identified three sources for her finding related to Claimant's ability to walk or stand, including (1) Dr. Boukhemis's RFC assessment, (2) ALJ Andrus's decision, and (3) the medical evidence of record. (Tr. at 20-21). However, these sources do not clearly support the ALJ's finding. First, it is undeniable that there are two interpretations of Dr. Boukhemis's RFC assessment form. Claimant, ALJ Andrus, and the Appeals Council all read the assessment form to say that Claimant was capable of standing or walking two hours out of an eight-hour workday. (*See* ECF No. 12 at 9; Tr. at 91, 105). The ALJ, on the other hand, interpreted Dr. Boukhemis's opinion to be that Claimant could stand/walk "two hours out of an eight-hour workday, four hours maximum." (Tr. at 21).

A review of the assessment form shows that Dr. Boukhemis never plainly stated that Claimant could stand or walk up to four hours. (Tr. at 866). Instead, on the assessment form, at item three, he marked the box stating that Claimant could stand or walk for *at least* two hours in an eight-hour workday. In a subsequent section of the form, which asked Dr. Boukhemis to "[e]xplain how and why the evidence supports your conclusions in item 1 through 5," and to "[c]ite the specific facts upon which your conclusions are based," Dr. Boukhemis wrote only: "2/4h…//8h" and "occasional limitations LE to foot controls." (*Id.*). He did not indicate to which items the notations

52

applied, nor did he provide any focused explanation or citations to the evidence in support of the notations. Thus, whether the "2/4h...//8h" note referred to Claimant's ability to stand or walk is simply not clear. The note may have been further clarification of Dr. Boukhemis's opinion regarding Claimant's "occasional" use of foot pedals. Moreover, the exact meaning of that shorthand note is uncertain. Certainly, it does not expressly state that Claimant could stand or walk a maximum of four hours in an eight-hour workday. As such, to the extent the ALJ made her RFC finding of Claimant's ability to stand or walk based upon this note by Dr. Boukhemis, the undersigned is unable to determine that the finding is supported by substantial evidence.

The ALJ's other two reasons for concluding that Claimant could stand or walk a maximum of four hours each workday are equally inadequate. First, the Appeals Council remanded ALJ Andrus's decision for further examination of Claimant's RFC finding, in part, precisely because the Appeals Council could not follow his reasoning in relation to Claimant's ability to stand or walk. As previously stated, like Claimant and the Appeals Council, ALJ Andrus interpreted Dr. Boukhemis's assessment to limit Claimant to "standing/walking for two hours out of an eight-hour workday," and ALJ Andrus found Dr. Boukhemis's opinions to be reasonable. (Tr. at 91). Nonetheless, ALJ Andrus determined that Claimant was capable of light level exertional work without further limitation regarding the number of hours Claimant could stand or walk. (Tr. at 89, 91). The Appeals Council pointed out that light level work generally required a good deal of standing or walking; consequently, ALJ Andrus should have discussed the standing or walking limitation in his decision. (Tr. at 105). Considering the error that the Appeals Council identified in ALJ Andrus's RFC finding, the ALJ was hard-pressed to rely on the prior decision in making her RFC finding.

Finally, the ALJ attempted to bolster her interpretation of Dr. Boukhemis's opinion regarding Claimant's ability to stand or walk by indicating that the four-hour limitation was "consistent with the medical evidence of record." (Tr. at 21). However, the ALJ never identified what evidence corroborated her determination, or was consistent with a finding that Claimant could stand or walk up to four hours.  (*Id*.). In view of the Appeals Council's explicit directive that the ALJ re-assess Claimant's ability to stand or walk on remand, the ALJ should have explained how the evidence supported her RFC finding on that point. An explanation in this case was particularly important given the two different readings of Dr. Boukhemis's opinion, and the lack of any effort to resolve the differences.

Having determined that the ALJ erred in the RFC finding, the Court must consider whether the error justifies remand. In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission*, 721 F.2d 1054, 1056 (6th Cir. 1983); *see, also*, *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). "[P]rocedural improprieties alleged by [a claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).

In this case, the vocational expert identified jobs for Claimant at the fifth step of the sequential disability process. The expert's opinions were based upon the RFC finding

54

provided by the ALJ. Given that the RFC finding may not fully account for Claimant's limitations, the vocational expert's opinions may not be accurate. At the fifth step, the Commissioner has the burden of demonstrating specific jobs that Claimant is capable of performing despite all of his functional limitations and vocational factors. The Commissioner did not effectively carry this burden. Therefore, the undersigned **FINDS** that the case should be remanded for further proceedings to fully address the Claimant's ability to stand or walk and how his limitations in standing or walking affect the type and number of jobs available to Claimant.

### B.  Opinion of Dr. Belgrave

Claimant next complains that the ALJ did not properly weigh the opinion of Dr. Claire Belgrave, one of Claimant's treating psychiatrists at Prestera. Claimant emphasizes that the ALJ misunderstood Dr. Belgrave's role in Claimant's treatment. Specifically, the ALJ indicated that there was no evidence to show if Dr. Belgrave was a treating physician and stated that "Dr. Belgrave had one visit with the claimant and only spent 15 minutes on her medical review" at a time when Claimant was still using drugs and alcohol. (Tr. at 22). Claimant argues that the ALJ is mistaken, because the record contains multiple evaluations by Dr. Belgrave. In addition, Claimant points out that the Appeals Council expressly ordered the ALJ to provide further consideration and clarification of the weight assigned to the opinion of Dr. Belgrave. (Tr. at 106).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's]

impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). In the absence of a treating physician's opinion that has been afforded controlling weight, the ALJ must analyze and weigh all of the medical source opinions in the record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.[6] *Id.* §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

---

[6] Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin*, No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at \*2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at \*2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at \*3.

The undersigned agrees that the ALJ's decision does not reflect a more

comprehensive evaluation of Dr. Belgrave's opinion than was included in ALJ Andrus's decision. Actually, much of the ALJ's discussion of Dr. Belgrave's opinion mirrors the discussion provided by ALJ Andrus. While it is true that the ALJ dropped the most confusing and contradictory line found in ALJ Andrus's explanation, the fact remains that the opinion was not considered to be a treating source opinion. The record substantiates that Dr. Belgrave treated Claimant on multiple occasions between February 1, 2012 and December 2012. At the time she prepared her written opinion, Dr. Belgrave had seen Claimant at least six times. Moreover, Dr. Belgrave had access to Claimant's records of treatment and assessments provided by Prestera, which by that point documented nearly two years of psychological care. Therefore, the undersigned **FINDS** that the ALJ erred in her evaluation of Dr. Belgrave's opinions. Because the re-weighing of a treating source's opinion could reasonably alter the outcome of the disability determination, the undersigned further **FINDS** that on remand, the ALJ should carefully consider and weigh Dr. Belgrave's opinion in accordance with Social Security rules and regulations governing the manner in which treating source opinions should be weighed.

Lastly, although not mentioned by Claimant, the ALJ should expressly consider and weigh the opinions offered by Dr. Belgrave and Dr. Bhardwaj, stating that Claimant would likely be absent from work more than five days per month for psychologically-based issues. The ALJ rejected those opinions, indicating only that she did not find such a limitation to be "supported by the medical evidence of record." (Tr. at 25). However, given the vocational expert's opinion that Claimant would not be employable if he missed more than five workdays per month, the ALJ's explanation for rejecting that limitation is inadequate. Moreover, the ALJ should consider Claimant's ability to stay on task. Significantly, when ALJ Andrus considered the case, he found that Claimant would be off

task for more than 20 percent of the workday approximately four times per month, based in part, on the medical source statements and psychiatric treatment records. (Tr. at 90-91). The ALJ did not make a similar finding despite that fact that after ALJ Andrus reached this conclusion, Claimant supplied additional psychiatric treatment records, which included a second admission to the Crisis Residential Unit and a hospitalization for an attempted suicide. Furthermore, Claimant supplied the mental functional capacity assessment prepared by his treating physician, Dr. Bhardwaj, opining that Claimant had severe psychological symptoms, which significantly reduced his ability to do work-related activities, including marked symptoms of being easily distracted and of having a pervasive loss of interest in almost all activities. Although ALJ Andrus's RFC finding regarding Claimant being occasionally off-task is not the same as missing five or more days of work per month, there are some similarities between the two findings. Therefore, the various medical source opinions regarding the impact of Claimant's psychological impairments on his ability to be mentally and physically present for work merit closer examination by the ALJ.

## VII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding United States District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 12), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g)

for further administrative proceedings consistent with the findings herein; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** November 21, 2016

Cheryl A. Eifert
United States Magistrate Judge